IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| TOREE JONES, AIS 268125, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:20-CV-542-RAH-CSC |
| ) | |
| JOHN Q. HAMM, ADOC Commissioner, ) | |
| in his official capacity; JEFFERSON S. ) | |
| DUNN, former ADOC Commissioner, ) | |
| in his individual capacity; CHARLES ) | |
| TIPTON, former Warden Red Eagle ) | |
| Work Center; ANGIE BAGGETT, ) | |
| ADOC Director of Classification. ) | |
| ) | |
| Defendants. ) | |

## **RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.   Introduction**

Plaintiff, Toree Jones, proceeding pro se and incarcerated at the Red Eagle Honor Farm in Montgomery Alabama, files suit under 42 U.S.C. § 1983 seeking injunctive relief on the allegation that his federally protected right to equal protection under the Fourteenth Amendment is being violated. Specifically, Jones alleges an Alabama Department of Corrections (ADOC) prison regulation has differing requirements for male and female inmates regarding their eligibility to be considered for minimum-community status which violates his right to equal protection. The named defendants are former Commissioner Jefferson Dunn in his individual capacity, Commissioner John Hamm in his official

1

capacity, (*former*) Warden Charles Tipton, and Director of Classification Angie Baggett. Doc. 1.

Defendants filed an Answer and Special Report with supplements, along with relevant evidentiary materials (*e.g.*, affidavits, prison documents). Docs. 19, 36, 43. After reviewing the Special Report the Court issued an Order on January 7, 2021, requiring Jones to respond to the report with affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. 20; *see also* Docs. 38, 41. This Order specifically cautioned that the "court may at any time [after expiration of the time for Jones to file a response] and without further notice to the parties (1) treat the [special] report and any supporting evidentiary materials as a motion to dismiss or motion for summary judgment, and (2) after considering any response …, rule on the dispositive motion in accordance with the law." Doc. 20 at 3. Jones thereafter filed responsive materials. Docs. 29, 40, 44. Pursuant to the January 7, 2021, Order, the Court now treats Defendants' Special Report as a motion for summary judgment and concludes it is due to be denied on Jones's equal protection claim asserted against them.

## II. Summary Judgment Standard

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party … . [A fact] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland*

*Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has satisfied that burden, the nonmovant is required to cite portions of the record showing a genuine dispute of material fact. *Id*. at 324. The nonmovant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish a genuine dispute of material fact, the nonmovant must produce evidence such that a reasonable trier of fact could return a verdict in its favor. *See Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

In determining whether a genuine dispute of material fact exists, the court must view all the evidence in a light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmovant's favor. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see also* Fed. R. Civ. P. 56(a). Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Summary judgment also should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. Relevant Facts[1]

Jones is incarcerated at a community work center (Red Eagle Honor Farm) where he is serving a 25-year term of imprisonment on a conviction for murder. Doc. 1 at 3. Pursuant to Alabama Department of Corrections ("ADOC") classification regulations, Jones's murder conviction makes him ineligible to be considered for eligibility to minimum-community custody status. *Id.* at 3–5; Doc. 1-1 at 1. However, Jones asserts that female offenders housed at a minimum security facility with a homicide conviction, whether past or present, are eligible for consideration under ADOC classification guidelines for such placement. Doc. 1 at 3; Doc. 1-2 at 1–2. Jones alleges the ADOC's gender-based classification protocol violates his federally protected rights under the Equal Protection Clause of the Fourteenth Amendment. Doc. 1 at 2–5. For relief, Jones requests that—like his female comparators—he be afforded eligibility consideration for minimum-community custody and works status to achieve rehabilitative opportunities and gainful employment. *Id.* at 7.

Defendants argue that Jones has failed to produce sufficient evidence to substantiate his claims of gender discrimination. *See* Doc. 19. They acknowledge that there are differences between the eligibility requirements for minimum-community status applicable

---

[1] Where facts are in dispute, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992). As such, the "facts" set forth herein are merely for purposes of resolving summary judgment and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400, *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) (citation omitted) (explaining that "what we state as 'facts' ... for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts").

to male and female inmates but maintain that Jones has not shown he is similarly situated with his female counterparts, that the treatment of male and female offenders with homicide convictions is substantially similar, and that the differences in male and female offenders justifies the different classification policies. *Id.* at 1, 7–9.

Defendants' evidentiary submissions include an affidavit by Stan Dean, a Classification Review Board Analyst with the ADOC since March of 2008. Doc. 19-1 at 1. He currently serves in that capacity on the ADOC's Central Review Board ("CRB"). *Id.* Defendants have also submitted an affidavit from Dr. Wendy Williams, the Deputy Commissioner for Women's Services since 2014. Doc. 19-3.

Defendants' evidence reflects that male inmates in minimum-community custody level may be gainfully employed in the community on a full-time basis and are supervised in a community-based facility when they are not working. Doc. 19-2 at 2. The ADOC's Male Classification Manual imposes an ineligibility requirement on male inmates for placement on minimum-community custody if they have convictions, past or present, for the following crimes:

> 1. Inmates convicted of adult sex offenses or juvenile or YOA [Youthful Offender Status] sex offenders.
>
> 2. Inmates with an adult felony conviction of record for assault or attempted assault involving a police officer, corrections officer or corrections employee while the victim was serving in their official capacity.
>
> 3. Inmates who commit and are convicted of a violent felony while serving their sentence in an ADOC community supervision program (SIR, PDL, SRP, work release).
>
> 4. Homicide cases, past or present. Inmates convicted of any traffic related homicide (manslaughter, criminally negligent homicide, leaving the

> scene of an accident (with injury)) are not barred. However, if the nomenclature of the conviction is "murder", they are ineligible. This includes Attempted Murder convictions.
>
> 5.   Three (3) or more separate felony convictions involving the use of a weapon or injury resulting from the use of a weapon within the past fifteen (15) years. (Note: Robbery of three people in the same offense would not fit this category.)

*Id.*

Since August of 2016, the ADOC and its Classification Division have implemented different eligibility requirements for male and female inmates regarding minimum-community custody, including work release. Doc. 19-1 at 1. Like the ADOC's Male Classification Manual, the ADOC's Women's Services Classification Manual imposes an ineligibility requirement on female inmates for placement on minimum-community custody if they have convictions, past or present, for adult sex offenses (excluding first offenses for sexual misconduct or indecent exposure) and sex offenses as a juvenile or youthful offender while still within the ten-year reporting requirement. Doc. 19-2 at 5. In 2016, the ADOC and its classification division changed the criteria applicable to female offenders' eligibility for minimum-community custody by creating a distinction for female inmates making them, unlike their male counterparts, eligible for minimum community custody if they meet the following criteria:

> 1.   All inmates with a property, non-violent, or prior violent conviction with a WRNA [Women's Risk Needs Assessment] score of 20 or below may be considered for Minimum-Community custody, contingent upon required program completion.
>
> 2.   Inmates convicted of a current violent offense (includes traffic related homicides) may be considered for Minimum-Community custody within four years of earliest possible release (i.e. EOS, parole consideration date).

> 3. Inmates convicted of a current homicide offense may be considered for Minimum-Community custody upon completing 50% of the sentence.
>
> 4. Inmates with life sentences for homicide are excluded from Minimum-Community custody consideration at this time.

Doc. 19 at 3; Doc. 19-2 at 5–6. The Female's Classification Manual further provides that "[a]lthough Burglary III, Escape I, and Trafficking charges are violent offenses by state statute, for classification purposes they will be assessed using non-violent classification criteria." *Id.* at 6.

Defendants state the reason for the difference in classification criteria is due to the differences between male and female offender background and behavior. Doc. 19-1 at 2. According to Dr. Williams, determining these differences is based on consideration between male and female offender pathways to criminal behavior.[2] Dr. Williams testifies that:

> Those differences arise out of the fact that the reasons or ways that women become involved in crime is qualitatively different from that of men. Women are more likely to have experienced poverty, sexual abuse and other forms of victimization. A large proportion of justice involved women have engaged in criminal behavior while under the influence and/or to support their drug use. Justice involved women are more likely to experience co-occurring disorders, substance abuse problems interlinked with trauma and mental illness. Fewer vocational skills, underemployment, and employment instability are more common among justice involved women than men. Not

---

[2] Dr. William's cites the following references in support of this statement: Belknap, J. (2007) The invisible women: Gender, crime, and justice (3rd ed.). Belmont, CA: Thompson Wadsworth; Bloom, B., Owen, B., & Covington, S. (2003). Gender-responsive strategies: Research practice and guiding principles for women offenders. Washington, DC: USDOJ, National Institute of Corrections; Salisbury, E. & Van Voorhis, P. (2009). Gendered pathways: An empirical investigation of women practitioners' paths to incarceration. *Criminal Justice & Behavior*, 36, 541-566.

> only are these factors more prevalent among justice involved women, they play a criminogenic role that must be addressed.
>
> Women's engagement in criminal behavior is often related to their relationships, connections, and disconnections with others. Exposure to dysfunctional and abusive relationships in childhood elevates risk for future victimization and the perpetration of violence. Women will often commit crimes to maintain a relationship regardless of the outcome. Criminal justice programs and interventions must encourage women to maintain a desire for healthy connection, while providing them with opportunities to learn new ways of connecting and relating to others.

Doc. 19-3 at 1–2 (footnotes 2–4 omitted). In addition to the foregoing, Dr. Williams states that gender-based differences in ADOC classification policies are based on the following indicators:

> (1) Most traditional criminal justice policies and practices are male-oriented and normed for male offender populations resulting in unreliable custody designations for women.
>
> (2) Women are more likely to be the primary caregiver for minors and more likely to provide for their care and support so minimum community jobs help make them better prepared for financial responsibility as a primary caregiver and allows them to provide financial assistance to their children's legal guardian while they are incarcerated.
>
> (3) Unlike men, once incarcerated, women more often lose their financial support structure due to abandonment by a spouse or partner.
>
> (4) Failure of women to develop or acquire work skills and ethics during incarceration make them more likely to recidivate upon release in more self-destructive ways than men.
>
> (5) Women, more often than men, enter the prison system with lower levels of education and fewer job skills, experience, or training making it more challenging for them to find jobs upon release in comparison to male inmates who are more likely to have a history of work, job skills, and training.
>
> (6) Women are denied work opportunities in minimum community custody and minimum out custody settings due to gender stereotypes and biases regarding physical strength, experience and familiarity with physical labor,

their emotional makeup, and workplace conflict, e.g., fabricating claims of sexual assault or sexual harassment.

(7) Women assigned to minimum out custody are less likely than men to recidivate in violent manner.

*Id.* at 2–6.

Based on the foregoing, Defendants argue that no equal protection violation has occurred because although male and female inmates are treated in a substantially similar fashion regarding the challenged classification policy they are not similarly situated. Doc. 19 at 1, Doc. 36 at 1. Specifically, Defendants assert male and female inmates are not similarly situated regarding the need for—and concerns created by—community custody assignment. Doc. 19 at 7–8; Doc. 36 at 3; *see also* Doc. 43. Additionally, Defendants maintain differences in how the majority male inmate population (90%) is treated in relation to the minority female inmate population (10%) are to be expected, but those differences do not demonstrate gender-based discrimination but "sound gender-informed correctional policy based on valid penological interests." Doc. 19 at 9. Finally, Defendants state that the Tutwiler Consent Decree allows the ADOC to treat male and female inmates differently. Doc. 19 at 9–10; Doc. 19-4. A federal court injunction requires the ADOC to offer and implement gender responsive classification policies for female offenders and there is no corresponding injunction regarding male inmates. Doc. 19 at 10.

## IV. Legal Standard

Under the Equal Protection Clause, no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This essentially directs that "all persons similarly situated should be treated alike." *City of Cleburne, Tex.*

9

*v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). While the Equal Protection Clause requires persons to be judged individually and receive equal justice under the law, *Plyler v. Doe*, 457 U.S. 202, 216 n.14 (1982), this does not necessarily mean all individuals must receive equal treatment. *Reed v. Reed,* 404 U.S. 71, 75 (1971). "If [government action] seeks to treat different groups of people differently, it must do so upon some ground of difference having a fair and substantial relation to the object of the [government action], so that all persons similarly circumstanced shall be treated alike." *Id*. at 76 (quotation marks and citation omitted).

The Supreme Court has varied the analysis of equal protection claims depending on the classification involved to determine whether a law or government action violates the Equal Protection Clause. *See e.g., Wygant v. Jackson Bd. Of Educ.*, 476 U.S. 267 (1986) (applying strict scrutiny analysis to race-based and ethnicity-based classifications); *City of Cleburne, Tex.*, 473 U.S. 432 (applying a rational basis test to classification of mentally retarded individuals). Between the rational basis review and strict scrutiny there is intermediate scrutiny. Intermediate scrutiny applies to laws that discriminate based on a quasi-suspect classification like gender. *United States v. Virginia*, 518 U.S. 515, 533 (1996).

While there may be any number of valid reasons prison officials have to treat men and women differently in certain aspects of prison management, the intermediate scrutiny standard recognizes the state's legitimate reasons to distinguish inmates based on gender. *Virginia*, 518 U.S. at 533-34. This analysis requires the state to demonstrate that their gender-based policy serves important governmental objectives that bear a substantial

10

relation to achieving those objectives. *See Craig v. Boren*, 429 U.S. 190, 197 (1976). The Supreme Court has also expressed the test as requiring an "exceedingly persuasive justification" for classifications based on gender. *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (quotation marks and citations omitted) ("[T]he party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an exceedingly persuasive justification for the classification … [which] is met by showing that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."); *Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc) (quotation marks and citation omitted) (explaining that "for a policy to be substantially related to an important governmental objective, there must be enough of a fit between the ... [policy] and its asserted justification."). While gender-based classifications may be used to address historical inequities or disabilities placed on women, "such classifications may not be used, as they once were … to create or perpetuate the legal, social, and economic inferiority of women." *Virginia*, 518 U.S. at 533-34; *Sessions v. Morales-Santana*, 582 U.S. 47, 62 (2017) (quotation marks and citation omitted) (recognizing that even if the objective of the challenged government action is to protect the members of one gender, that objective itself is illegitimate if it relies on "fixed notions concerning that gender's roles and abilities.").

V.   **Discussion**

A.   **Different Treatment**

Initially, the Court observes that the law is settled that inmates have no constitutionally protected interest in the level of their custody classification. *See Moody v. Daggett,* 429 U.S. 78, 88 n. 9 (1976). Even for offenders who meet eligibility requirements for a particular custody status, assignment to that level of custody is neither constitutionally required nor guaranteed. *See Id.* This case, however, concerns an allegation that a prison classification regulation discriminates against male offenders housed in minimum security facilities via a blanket policy barring them from being considered for eligibility to minimum-community custody status if they have a past or current homicide conviction. Unlike their male counterparts, Jones maintains female prisoners housed in minimum security facilities with a past or current homicide conviction are eligible to be considered for this lowest level of custody. Doc. 1.

As explained, Defendants concede that the challenged classification regulation treats male offenders like Jones differently from his female comparators for the purpose of allowing them consideration for eligibility to minimum-community custody but argue these offenders are not similarly situated. Doc. 36 at 1. Specifically, Defendants maintain that higher rates of recidivism, violence, and escapes in the male offender population, including male offenders in community work centers or work release centers, demonstrates the evidence-based rationale for the dissimilar treatment. Doc. 36-1 at 1–2; Docs. 36-4, 36-5. For example, Dr. Williams states that since 2018 there have been 92 escapes by male offenders (almost always in the context of inmates housed at community work centers)

compared to one escape by a female inmate during the same time. Doc. 36-1 at 1–2. Dr. Williams further testifies that:

> Regarding the comparison of violent acts committed by male offenders and female offenders assigned to work centers and work release centers, ADOC data shows male offenders are more violent. For instance, in FY 2018, of the 40 assaults committed at such facilities, none of the assaults were committed at female work centers or work release centers, all 40 occurred at male facilities. For the same year, of the 14 fights recorded at work centers or work release centers, none involved female offenders. In FY 2019, of the 50 assaults committed at work centers and work release centers, only three of the assaults were committed at female work centers or work release centers. For the same year, of the 30 fights recorded at work centers or work release centers, only four involved female offenders. And in FY 2020, of the 46 assaults committed at work centers and work release centers, none were committed by female offenders at such facilities. For the same year, of the 47 fights recorded at work centers or work release centers, only one involved female offenders. (See [Doc. 36-5 at 1–9], ADOC Statistical Reports).
>
> Knowledge of these differences between male and female offender behavior (as well as the other factors described in my previous declaration) as well as our experience with inmates in the Alabama Department of Corrections all played a role in reaching the determination that male and female inmate behavior while assigned to community custody is *dissimilar* and they should be treated differently in terms of qualifying for community custody assignment.

Doc. 36-1 at 2 (emphasis in original); Doc. 36-5. Additional reasons Defendants offer in support dissimilar treatment include (1) implementation of gender-responsive policies, procedures, and services to address the unique risk factors and pathways by which women offenders become involved in the justice system (2) prison programing which has

13

traditionally favored male offenders and (3) development of the ADOC's current classification system with experts pursuant to the Tutwiler consent decree.[3] Doc. 36 at 2.

Jones contends that male and female inmates housed at minimum security facilities are similar in terms of how they are subject to placement there, their actual security classification, the average length of their sentences, and that there are no special characteristics to distinguish them other than gender. Doc. 29 at 1. And similar to the pathways by which women become involved in the justice system, Jones maintains men also experience many of these same pathways including poverty, sexual abuse, the influence of drugs, lack of vocational training, and mental illness. *Id*. at 2. Further, Jones asserts Defendants' evidence fails to show how female offenders with a homicide conviction are less violent then their male counterparts who commit the same or similar offense, and argues their statistical evidence makes no clear case to support the differential treatment of male offenders regarding the challenged classification policy. Doc. 40 at 1–5.

Courts are required to take a "hard look" at official distinctions among groups based on their supposedly inherent differences, without relying on overly broad generalizations about how they compare to one another. *See Virginia*, 518 U.S. at 541, 550. The court has carefully reviewed Defendants' evidence in support of their argument that the challenged classification policy does not violate the equal protection principle requiring similarly situated people be treated alike. However, and notwithstanding the reasons proffered, if

---

[3] The consent decree's stated goal is to "ensur[e] that inmates at the Julia Tutwiler Prison for Women are provided with constitutional conditions that protect them from sexual abuse and sexual harassment" from correctional staff. Doc. 19-4 at 1.

gender is not the motivating or determinative criterion for the differing classification policy challenged, it is not otherwise clear on this record that the differences in inmate characteristics cited by Defendants means Jones and his female comparators are not similarly situated. *See Keevan v. Smith*, 100 F.3d 644, 652 (8th Cir. 1996) (Heaney, J., dissenting) (quoting *Pargo v. Elliott,* 49 F.3d 1355, 1356 (8th Cir. 1995) (stating that "[w]hile the segregation of inmates by gender is constitutional, the natural consequences of that segregation—e.g., smaller institutions, shorter aggregate lengths of stay, broader ranges of security ratings within institutions—must not be used as a per se bar to our examination of the respective treatment women and men receive while incarcerated. If our equal protection inquiry ended every time a plaintiff fell short of showing different treatment at a mirror-image facility, then despite our admonition to the contrary, *Klinger [v. Dep't. of Corrs.*, 31 F.3d 727, 731 (8th Cir. 1994)], would 'stand for the proposition that women and men prison inmates can never be similarly situated for purposes of equal protection analysis.'").

> **B.**   **Level of Scrutiny**

Jones alleges a violation of his right to equal protection based on a prison classification policy which has a disparate impact on male offenders. In evaluating Jones's claim in the prison context, the court applies an intermediate level of scrutiny to consider whether the policy serves an important governmental objective and is substantially related to the achievement of those objectives. *See e.g., Harrison v. Kernan*, 971 F.3d 1069, 1076–80 (9th Cir. 2020); *Roubideaux v. N. Dakota Dep't of Corr. & Rehab.*, 570 F.3d 966, 974 (8th Cir. 2009); *Pitts v. Thornburgh*, 866 F.2d 1450, 1453–55 (D.C. Cir. 1989); *Mary Beth*

*G. v. City of Chicago*, 723 F.2d 1263, 1273–74 (7th Cir. 1983); *Young v. Cnty. of Cook*, 616 F. Supp. 2d 834, 853 (N.D. Ill. 2009); *Ashann–Ra v. Com. of Virginia*, 112 F. Supp. 2d 559, 570–71 (W.D. Va. 2000); *Otero v. Dart*, 2016 WL 74667, at *10 (N.D. Ill. Jan. 7, 2016); *see generally Adams*, 57 F.4th at 801 (applying intermediate scrutiny to a gender-based policy in a school setting).

The court considers from Defendants' arguments and evidentiary submissions that justifications for the challenged gender-based policy are motivated primarily by the objectives of prison safety and security and affirmative action measures to compensate female offenders for historically male-centric prison policies, including classification policies. *See* Docs. 19, 36. Additional objectives focus on differences in how females come into the justice system, behavioral differences between males and females housed in prisons, work release settings, and upon release from incarceration, how there are more male than female prisoners, how there are more male than female penal facilities, how men "create more problems than women," and how the ADOC is making efforts to "catch up" in treatment of female offenders. *See* Doc. 19 at 8–9; Doc. 36 at 1–2; Doc. 43 at 2–3. In terms of the scope of the claim presented, Jones essentially argues that Defendants' broad arguments fail to show how his exclusion from being considered for eligibility to minimum-community custody, unlike his female counterparts, serves the state's purported objectives. Docs. 29, 40, 44.

The Court has carefully reviewed the record and finds there is little exceedingly persuasive evidence that the challenged classification policy furthers Defendants' stated objectives or is the driver of the actual purpose on which the challenged action is based.

There may be legitimate correctional needs and concerns which might be compromised by providing male offenders such as Jones equal access to eligibility consideration for minimum-community status. But, as noted, gender-based obstacles or disparity require "exceedingly persuasive" justification. *Virginia,* 518 U.S. at 533; *see also West v. Virginia Dep't of Corr.*, 847 F. Supp. 402, 405 (W.D. Va. 1994) (quotation marks and citation omitted) (observing that that distinctions based on gender may be justified by important governmental interests in recognizing demonstrated differences between males and females, but intermediate scrutiny does not permit regulations to be based on stereotypical and generalized conceptions about the differences between males and females.").

Assuming, without deciding, that the ADOC must individually review all inmates to determine their custody status, the reasons given for the disparity in the challenged policy are overbroad making it difficult to discern a substantial relationship between the purported justifications to important governmental interests. Differences certainly exist between female and male offenders requiring that classification eligibility decisions be based on any number of circumstances, but those differences exist along the entire spectrum of these determinations. Judicial notice is taken of court records which reflect that individual offender's eligibility for various custody levels is determined on a case-by-case basis.[4] *See Dixon v. Hamm*, Civil Action No. 2:20-cv-524-RAH-CSC (M. D. Ala.) (Doc. 33-1 at 2-5 (*ADOC Male Classification Manual – Reviews for Reduction In Custody*

---

[4] *See Nguyen v. United States*, 556 F.3d 1244, 1259 n.7 (11th Cir. 2009) (noting the court may take judicial notice of its own records and the records of other federal courts).

*Level/Institutional Placement*)). Inasmuch as prison officials already review inmate backgrounds in assessing their eligibility for various levels of custody classification, Defendants' evidence has not adequately demonstrated that the challenged exclusionary policy serves an important government interest or that the justifications proffered in this regard are "exceedingly persuasive." Additionally, and without more, that both female and male sex offenders are barred from eligibility consideration for minimum-community custody undercuts Defendants' arguments for treating male and female inmates differently regarding the challenged classification policy.

The Court is certainly mindful that prison officials must balance many institutional needs with limited resources, not the least of which may involve security concerns, when determining offender classification regulations and policies. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."). Whether the justifications being advanced have direct bearing on whether the current blanket policy of exclusion are narrowly tailored to or advances any of Defendants stated objectives, or that the discriminatory means employed are substantially related to the achievement of those objectives, is unclear on this record. Put another way, questions of material fact remain regarding how the challenged gender-based classification policy is substantially related to important government interests and that the justifications given for the differential treatment are "exceedingly persuasive." *Virginia,* 518 U.S. at 556.

Accordingly, Defendants' motion for summary judgment on Jones's equal protection claim is due to be denied.

## VI. Conclusion

The undersigned Magistrate Judge RECOMMENDS as follows:

1. Defendants' Motion for Summary Judgment (Doc. 19) on Plaintiff's equal protection claim be DENIED.

2. This case be set for a jury trial on Plaintiff's equal protection claim against Defendants.

It is further ORDERED that any objections to this Recommendation must be file by **August 4, 2023**. An objecting party must identify the specific portion of the factual findings or legal conclusions to which the objection is made and must describe in detail the basis for the objection. Frivolous, conclusive, or general objections will not be considered. This Recommendation is not a final order and, therefore, it is not appealable.

Failure to file a written objection to this Recommendation shall bar a party from a de novo determination by the District Court of any factual findings or legal conclusions contained herein and shall waive the right of the party to challenge on appeal any subsequent order that is based on factual findings and legal conclusions accepted or adopted by the District Court, except upon grounds of plain error or manifest injustice. 11th Cir. R. 3-1; *see Resol. Tr. Corp.. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

Done, this 21st day of July 2023.

    /s/   Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE